Filed 10/13/25  P. v. Nava CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROMULO NAVA, JR.,<br><br>    Defendant and Appellant. | B330921<br><br>(Los Angeles County<br>Super. Ct. No. BA249009) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David R. Fields, Judge.  Affirmed.

Debbie Yen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General, for Defendant and Respondent.

_____

## INTRODUCTION

Romulo Nava, Jr., was convicted of first degree murder in 2004. Nava petitioned for resentencing under Penal Code section 1172.6.[1] The superior court held an evidentiary hearing and denied Nava's petition, finding Nava was guilty of murder as an aider and abettor of express malice or implied malice murder. Nava argues there was no substantial evidence to support the superior court's determination.[2] He also contends the court misunderstood the elements of aiding and abetting implied malice murder and further failed to consider his youth as a factor in determining his culpability. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Trial, Conviction, and Sentence*

In 2003, Nava and two codefendants—Brenda Martinez (Martinez) and Gerardo Martinez (Tank)—were charged with murder (§ 187, subd. (a)) for the killing of Sebero Ruiz. The People alleged as to all defendants that a principal intentionally discharged a firearm causing great bodily injury and death to Ruiz (§ 12022.53, subd. (d)), and that the murder was committed

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Along with his opening brief, Nava (through appointed counsel) filed a petition for writ of habeas corpus, arguing his conviction for first degree murder violates *People v. Chiu* (2014) 59 Cal.4th 155. By way of separate order, we direct the superior court to issue an order to show cause returnable in that court on Nava's habeas corpus petition.

for the benefit of and in association with a criminal street gang (§ 186.22, subd. (b)(1)).

Nava was tried by a jury.[3]  The People introduced evidence that on the afternoon of June 12, 2003, Ruiz and his friend Sergio Guzman visited the Family Farms Market in Los Angeles.  At trial, Ruiz's sister and Guzman testified that neither of them was "connected with any kind of a gang."

Guzman testified that as he and Ruiz approached the market, two people drove by in a blue Toyota.  The driver (who Guzman later identified as Nava) asked Ruiz and Guzman "what gang [they] were from."  Ruiz and Guzman did not respond.  At trial, Los Angeles Police Department (LAPD) officer and gang expert Jerry Ballesteros testified the question "where are you from" is "the most frequent prelude to a shooting."

Ruiz and Guzman entered the market and bought beer.  Guzman stayed in the market to buy a lottery ticket, and Ruiz walked toward the exit.  As Guzman removed his tickets from the lottery machine, he heard gunshots and saw Ruiz fall to the ground in the doorway of the market.  Ruiz suffered multiple gunshot wounds and died from his injuries.  Guzman later identified Tank as the shooter from a photo array presented by police.

---

[3]	At the People's request, and absent opposition from Nava, we take judicial notice of the complete reporter's transcript of Nava's trial from the record in his related habeas corpus proceeding.  (See Evid. Code, §§ 452, subd. (d), 459; accord, *People v. Velasco* (2023) 97 Cal.App.5th 663, 668, fn. 3 [taking judicial notice of record in related appeal and habeas corpus proceeding].)

Officers from the LAPD responded to the scene of the shooting. Responding officers knew the area surrounding the Family Farms Market to be "contested by gangs," including the "38th Street" gang and "Barrio Mojados Sureños," also known as "BMS." That day they observed graffiti on the southeast wall of the market indicating "38th Street obviously had been in the area and written on the wall, claiming the area as their turf, and B.M.S. had seen it, marked it out, and put their moniker, or their gang sign above it, reclaiming the area" as a "sign of hostility." Police recognized the BMS graffiti as originating from the "49th Street . . . clique of Barrio Mojados." Officer Ballesteros testified that 38th Street and BMS were "rivals" and that "crossing out graffiti" is "often a prelude to violence."

Police reviewed video surveillance footage of the shooting from the Family Farms Market. The video showed that at 4:45 p.m., a "blue car" drove through the market parking lot, then left. Ruiz and Guzman were shown walking into the market at the same time. Approximately five minutes later, the footage showed two people, "[a] male and female Hispanic," entering the market, then leaving together about one minute later. The man was "larger" and wore a baseball cap. Responding Officer David Nunn of the LAPD recognized this man as Tank, an "admitted" BMS member whom Nunn had personally met a year before in connection with a different crime. Police knew Tank as a "dangerous character" and suspected him "of being involved in the killing of an individual from 38th Street" earlier in the year. The woman was later identified as Martinez.

4

As captured on surveillance video, Tank stood in the parking lot, "looking towards the store for a couple moments, and then he approached the southern entrance to the store." Tank "punch[ed] and then sho[t] Sebero Ruiz."

Police located the blue Toyota the following day, which belonged to Nava's father. Police searched Nava's home. In Nava's bedroom, they found a photograph of Nava "flashing a gang sign" affiliated with BMS and another photograph of four men with the words "Weteros" and "BM43" written in marker. Police testified these terms referred to BMS.

Police arrested Nava and Martinez and transported them to the Newton Police Station.[4] Police first interviewed Martinez. Martinez declined to testify at Nava's trial, but the content of her interview was introduced through the testimony of LAPD Officer Elizabeth Rico.

Officer Rico testified that Martinez told her she was a member of BMS, specifically the 49th Street clique. Martinez reported that on the day of the shooting she was in the car with Nava when they passed by two men "they both thought . . . were from 38th Street." Martinez stated she and Nava "yelled out, 'Fuck Tramps, it's all about B.M.S.'" Officer Rico understood "Tramps" to be "a derogatory term used for 38th Street." Martinez described that the men "kept walking" and "didn't say anything in return," then "Nava stated that he was going to go get one of his homies, and then they drove over to Tank's house." Tank's home was "just a couple of blocks" from the market. Martinez knew Tank as "the big guy," and she identified him from a photo array during the interview.

---

[4] At the time of trial, Tank was still at large.

According to Martinez, "Nava got out of the car, went to a rear house, and h[e] and the big guy came out." Martinez could see a gun in Tank's waistband as he joined them in the car. Martinez stated that the "three of them returned back to the market," "she exited the car with the big guy, [and] they went into the store. She pointed out the two men that she thought were from 38th Street, [who] were buying some liquor at the time. [She] and the big guy exited the store. Mr. Nava was waiting for her in the parking lot. She entered the car. After that, they drove out of the parking lot, leaving the big guy there at the store, and they waited around the corner." Martinez "heard the shots, at which time they looked back and they could see the big guy running towards the car. He got into the rear seat and said, 'Go, go, go,' and they took off. . . . [T]he big guy threw his gun out the window and they proceeded to Mr. Nava's house."

LAPD Officer Gregory McKnight then interviewed Nava; Martinez was also present. The People introduced a tape recording and transcript of Nava's police interview at trial. Nava told Officer McKnight that Martinez was his girlfriend. Nava stated he was "not a BMS gang member," and he initially "denied any involvement" with the shooting. Eventually, Nava stated Tank "asked me for a favor to take him to the store," but "he never showed us a gun," and "I took him to the store with good intentions." Nava thought Tank entered the market to "buy[] something," when he heard gunshots and saw Tank "running." Nava stated he started to drive away but he "had to stop" the car "[bec]ause [Tank] had the gun in his hand." According to Nava, Martinez said "'Here come[] the cops,' and [Tank] said, 'Step on

6

it.'"  Nava confirmed that Tank threw the gun out of the car window on the way to Nava's house.

Nava did not testify at trial and introduced no evidence in his defense.

As relevant here, the jury was instructed it could find Nava guilty of murder pursuant to the natural and probable consequences doctrine if Nava aided and abetted a "simple assault" or "brandishing [of] a firearm," and "the crime of murder was a natural and probable consequence" of those crimes.

The jury convicted Nava of first degree murder and found the special allegations true.  The trial court sentenced Nava to a total prison term of 50 years to life.

B.    *Resentencing Proceedings*

Nava filed a petition under former section 1170.95, now section 1172.6.  Nava alleged he was convicted under the natural and probable consequences doctrine, but he could not now be convicted of murder because of changes to sections 188 and 189 made by Senate Bill No. 1437.

The People conceded that Nava made a prima facie showing for resentencing relief, and the superior court set the case for an evidentiary hearing.  At the hearing, the People introduced a transcript of Nava's post-arrest interview with police and transcripts of the witness testimony from Nava's jury trial.  No other evidence was presented.

The People argued that Nava aided and abetted express malice murder with the intent to kill Ruiz because he "initiated" the plan to return to the market with Tank, then "stood by as a getaway driver while Brenda Martinez pointed out the victims to Tank and returned to the getaway car to wait for Tank to

7

complete the mission." The People further argued that Nava aided and abetted implied malice murder if he intended to aid the shooting or even the brandishing of a gun, because it was "foreseeable" that "Tank would simply shoot [the intended targets] on sight for the earlier disrespect or for them merely being in rival territory."

Nava, through appointed counsel, argued this evidence was insufficient. Although Nava acknowledged the jury "found a gang enhancement to be true," he argued there was no other evidence he "kn[e]w what the shooter [was] going to do . . . other than the mere fact that he [was] associated or a member of a gang with the shooter."

The superior court found Nava was guilty of aiding or abetting express or implied malice murder, and it denied the section 1172.6 petition. The court rejected the argument that Nava was "just simply a driver and happen[ed] to be with these two people and d[id]n't know what's going to happen." Although the court acknowledged Nava's version of events, it observed:

> [W]hen you look at M[s]. Martinez's statement, it's much more incriminating for Mr. Nava that essentially when they saw these two people they thought were gang members and he yelled out to them about his own gang, 'It's all about BMS," they didn't respond.
>
> And so he said, okay. Now I'm going to go get one of my homies. And he goes and gets Tank and brings him back. And Tank's got a gun. . . . [A]nd then after the shooting, he's the one who is driving them off.

8

So I think it's . . . much more than him not knowing what was going to happen.  I think he was the one who went and got Tank after these two people, you know, disrespected him in some way.

And clearly he's a member of the gang.  It's proven up at trial.  And so I do find that under the express malice theory that Mr. Nava aided and abetted the shooting and murder of the victim in the case and aided the victim with the intent to kill.  He brought the gun.  Tank brought the gun.  He went and picked him up to get the gun there.  He and Martinez go into the market to find these guys."

As to implied malice, the court found that in the context of "the brandishing of the gun," "what [Nava] did as aider and abettor was conduct that was a life[-]endangering act," specifically, "getting Tank, bringing him back and having Tank brandish the gun and ultimately shoot."

Nava timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*

In 2018, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended the law of murder.  (See *People v. Strong* (2022) 13 Cal.5th 698, 707, fn. 1.)  "As relevant here, the bill amended section 188 to provide that, except in cases of felony murder, 'in order to be convicted of murder, a principal in a crime shall act with malice aforethought.'  [Citation.]  This change 'bars a

9

conviction for first or second degree murder under a natural and probable consequences theory.'" (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*).)

Senate Bill No. 1437 also created section 1172.6, "provid[ing] an opportunity for criminal defendants who were convicted of murder under . . . a natural and probable consequences theory . . . and who could not be convicted of murder under the law as it currently stands—to file a petition to be resentenced." (*People v. Arellano* (2024) 16 Cal.5th 457, 463-464.) "[T]he section 1172.6 petitioning 'process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . Section 188 or 189. . . ."' [Citations.] Upon receiving a complying petition, and after affording the parties an opportunity to submit briefing, 'the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. . . . .' (§ 1172.6, subd. (c).)." (*People v. Antonelli* (2025) 17 Cal.5th 719, 724.)

If a petitioner files a facially valid petition and makes a prima facie showing for relief, the court "must issue an order to show cause and hold an evidentiary hearing on the ultimate question of resentencing . . . ([§ 1172.6], subd. (d))." (*People v. Patton* (2025) 17 Cal.5th 549, 556.) At the evidentiary hearing, "'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder' under state law as amended by [Senate Bill No. 1437]. (§ 1172.6, subd. (d)(3).) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and

the petitioner shall be resentenced on the remaining charges.' (*Ibid*.)"  (*People v. Emanuel* (2025) 17 Cal.5th 867, 880 (*Emanuel*).)  The court may consider at the hearing "evidence previously admitted at any prior hearing or trial that is admissible under current law," as well as "new or additional evidence" offered by the prosecutor or petitioner.  (§ 1172.6, subd. (d)(3).)

At the evidentiary hearing, "the trial judge is charged with determining, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder.  [Citations.] Although the parties may offer new or additional evidence to meet their respective burdens, section 1172.6, subdivision (d)(3) does not contemplate a whole new trial on all the elements of murder. . . .  [T]he focus at the evidentiary hearing phase of an 1172.6 petition is 'on evidence made relevant by the amendments to the substantive definition of murder,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder acted with malice aforethought.'"  (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952 (*Vargas*); accord, *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).)

We review the denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence.  (See *Emanuel*, *supra*, 17 Cal.5th at p. 885.)  "Under this standard, 'we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact"'" could find beyond a reasonable doubt" that the petitioner is guilty of murder under the amended law.  (*Ibid*.)  The reviewing court must presume in support of the

11

judgment "'the existence of every fact the trier could reasonably deduce from the evidence,'" including any "'logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.'" (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125; accord, *Vargas*, *supra*, 84 Cal.App.5th at p. 951.) We do not reassess "'"credibility issues nor evidentiary conflicts."'" (*People v. Schell* (2022) 84 Cal.App.5th 437, 442 (*Schell*).)

B.      *Substantial Evidence Supports the Superior Court's Determination Nava was Ineligible for Resentencing Under Section 1172.6*

Nava argues the superior court lacked substantial evidence to find him guilty of aiding and abetting express or implied malice murder under current law. We determine the superior court had substantial evidence to find Nava guilty of aiding and abetting implied malice murder. As a result, we need not reach Nava's argument that there was no substantial evidence he aided and abetted express malice murder.

A defendant is liable for aiding and abetting implied malice murder if he aids the direct perpetrator in the commission of a life-endangering act with "'knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes*, *supra*, 15 Cal.5th at p. 991.) Nava does not dispute that Tank committed an act dangerous to human life by brandishing a firearm. (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1425 ["It is settled that brandishing a loaded firearm at a person is an act dangerous to human life."]; accord, *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 109-110 (*Nieto Benitez*) ["where the

12

defendant obtains a lethal weapon and then engages the victim in an argument, malice may be implied—from the circumstances leading to the killing—to support a conviction of second degree murder"].) Nava also does not dispute that his "words or conduct" aided Tank's commission of this act by driving Tank to and from the market. (*Reyes, supra*, 14 Cal.5th at p. 991 [actus reus for aider and abettor].)

Rather, we consider Nava's mental state: whether Nava knew Tank intended to commit a life-endangering act and intended to aid Tank in that act, with knowledge that the act was dangerous to human life and with conscious disregard for human life. (See *Vargas, supra*, 84 Cal.App.5th at p. 952 ["[T]he focus at the evidentiary hearing phase of an 1172.6 petition is 'on evidence made relevant by the amendments to the substantive definition of murder,' which, in the context of section 188, requires 'the prosecution to prove that all principals to a murder acted with malice aforethought.'"].) Nava argues he did not have knowledge that Tank intended to commit a life-endangering act and nor did he have intent to aid Tank in that act.

Substantial evidence supports the superior court's determination that Nava knew Tank intended to commit a life-endangering act by brandishing a firearm and that Nava intended to aid Tank in this act. The evidence at trial showed that Tank, Martinez, and Nava were members of BMS and that murder was a "primary activity" of BMS and the jury found that the murder was committed for the benefit of the gang. Martinez told police that, after she and Nava encountered men who appeared to be rival gang members, asked what gang they were from, and announced themselves as BMS, it was Nava's idea to visit Tank and bring him back to the market. Gang expert

13

testimony from the trial supported that a gang member asking "where are you from" is a "frequent prelude to a shooting." Police testimony further corroborated that the Family Farms Market was disputed territory between BMS and 38th Street (the gang Nava believed he encountered) and that such disputes could lead to violence. After they reached the market and Martinez pointed the men out to Tank, Nava drove Martinez out of the market parking lot and "around the corner" to wait for Tank, further suggesting Nava knew the plan was to confront the supposed rivals.

The superior court could reasonably infer from this evidence that, by bringing Tank to the market minutes after challenging apparent rival gang members, Nava knew and intended that Tank would initiate a confrontation with the victim, including a shooting. (See *Vargas*, *supra*, 84 Cal.App.5th at p. 954 [substantial evidence for aiding and abetting implied malice murder where petitioner was "inextricably involved in the events that led to the murder," shared gang membership with perpetrators, and murder occurred in gang territory]; *Schell*, *supra*, 84 Cal.App.5th at p. 443 [same, given petitioner's "companionship with other perpetrators, his conduct before and after the crimes, and his motive of retaliation for disrespect"]; *Clements*, *supra*, 75 Cal.App.5th at p. 299 [same, where petitioner "solicited [perpetrator] to assault [victim]" and "understood the risk of her solicitation" due to perpetrator's "proclivity for violence"].)

Substantial evidence also supports that Nava knew Tank intended to confront the victim with a firearm and Nava intended to aid him in this act. Nava entered Tank's house, and when the two emerged, Martinez could see a gun in Tank's waistband. The

14

superior court could reasonably infer from these circumstances that if Martinez could see the gun on Tank's person, Nava therefore knew Tank was bringing a gun to the market. (Cf. *People v. Gudiel* (2024) 107 Cal.App.5th 848, 860 [substantial evidence of aiding and abetting implied malice murder because petitioner "knew his codefendants, when they exited the car with baseball bats, intended to commit life-threatening violence on the victim"].) The court could also reasonably infer that Tank had retrieved the gun from inside his home while Nava was present. When they heard gunshots, Martinez told police she and Nava "looked back" and waited for Tank to run out and get in the car before driving away. The superior court could reasonably infer Nava's knowledge that Tank would use a gun in confronting the victim (and his intent to aid Tank's actions) from his reaction to the gunshots: looking for Tank to run out of the market, then waiting for him before driving away.

Nava argues that there was insufficient evidence to find he knew Tank had a gun, and that the superior court "failed to make such a finding." To the contrary, the superior court found that Nava "went and picked [Tank] up to get the gun" and that Nava "ha[d] Tank brandish the gun and ultimately shoot." Nava argues there was "no direct evidence that [Nava] knew Tank had a gun prior to the shooting," "no evidence as to what, if anything, was said between Tank and [Nava]," and there were "many innocuous reasons as to why [Nava] could want to get his 'homie' . . . that could be unrelated to wanting Tank to bring a gun or murdering Ruiz."[5]

---

[5] In support, Nava relies on *People v. Killebrew* (2002) 103 Cal.App.4th 644 and *People v. Southard* (2021)

15

Although there was no direct evidence on these matters, as stated, the circumstantial evidence supports a reasonable inference that Nava knew Tank intended to confront suspected rivals with a gun and intended to aid Tank in doing so. "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. [Citations.] 'Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on [substantial evidence review] remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208; see *People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697 ["It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence."].) Where, as here, substantial circumstantial evidence exists, we must affirm even if "'"'the circumstances might also reasonably be reconciled with a contrary finding.'"'" (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066; accord, *People v. Vargas* (2020) 9 Cal.5th 793, 820.)

---

62 Cal.App.5th 424. These authorities do not bolster his argument. *Killebrew* reversed a conviction for the admission of expert testimony improperly opining on the defendant's "subjective knowledge and intent," to the effect of "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun." (*Killebrew*, at pp. 652, 658.) In *Southard*, an erroneous jury instruction suggested the jury should disregard the defendant's mental state, a "hotly contested" issue. (*Southard*, at pp. 437-438.) Neither error occurred at Nava's evidentiary hearing.

Nava further argues that even if the evidence showed he knew Tank had a gun, "there was insufficient evidence that [he] knew that Tank was going to use the gun to shoot at Ruiz or that appellant intended to aid Tank in doing so." In support, Nava cites *Reyes, supra,* 14 Cal.5th 981.

In *Reyes*, the California Supreme Court reversed the denial of a section 1172.6 petition after an evidentiary hearing. (See *Reyes, supra*, 14 Cal.5th at p. 984.) Petitioner Andres Reyes and a group of fellow young gang members were in a park, when one member of the group, Francisco Lopez, showed off "a revolver he was carrying." (*Id.* at p. 985.) Later in the day, Reyes and some members of the group "proceeded on their bicycles to an area on the edge of territory belonging to a rival gang." (*Ibid.*) One member called out to a passing car, "Hey, Homey, stop. We want to talk to you," but "[t]he car sped up, and the group chased after it." (*Ibid.*) During the chase, one of the bicyclists, possibly Lopez, shot and killed the driver of the car. (*Ibid.*) Forty minutes later, Reyes used the murder weapon to confront a different person, Felix Nieves, asking him "what 'barrio' he belonged to" and challenging him to a fight. (*Ibid.*) Reyes and his companions assaulted Nieves, and "Reyes stood behind Nieves and held a gun to the back of his neck," but Nieves was able to flee the encounter. (*Ibid.*)

Based on these facts, the resentencing court denied the petitioner section 1172.6 relief, finding Reyes guilty of implied malice murder as a direct perpetrator.[6] (See *Reyes*, *supra*,

---

[6] In *Reyes*, *supra*, 14 Cal.5th 981, the superior court also impliedly found that Reyes was guilty of implied malice murder as an aider and abettor. (See *id.* at p. 987.) The California

14 Cal.5th at p. 987.) The superior court found that "Reyes intentionally committed the act of traveling 'along with several other gang members, one of which [was] armed, . . . to rival gang territory,' '[t]he natural and probable consequences of the act were dangerous to human life,'" and Reyes knew this risk and consciously disregarded it. (*Ibid.*)

The California Supreme Court reversed, holding that there was insubstantial evidence to find Reyes guilty of implied malice murder as a direct perpetrator. The Court emphasized that there was no evidence that "Reyes committed an act that 'proximately caused' [the victim's] death," because no evidence showed that Reyes was the shooter or that his "acts precipitated or provoked the shooting." (*Reyes*, *supra*, 14 Cal.5th at pp. 988-989.) The Court further held that Reyes did not commit an act "'dangerous to human life'" by "traveling to rival gang territory with several other gang members, one of whom was armed." (*Id.* at p. 989.) Although "[i]t may have been likely that this act would result in some sort of gang confrontation, and it [was] possible that someone would get hurt or killed," the court found no evidence that this behavior "was dangerous to life such that it satisfied the actus reus element of implied malice murder." (*Id.* at pp. 989-990.)

Nava argues that the evidence of his guilt is "significantly less" than the evidence in *Reyes* because the evidence there showed Reyes "was a gang member, knew the shooter had a gun yet accompanied the shooter along with other gang members to disputed turf, and actively pursued the victim prior to the

_____

Supreme Court reversed this determination based on an error of law, which we discuss further below in Discussion.C. (See *id.* at pp. 990-992.)

18

shooting." In *Reyes*, however, the Court held these facts did not support that Reyes was guilty of implied malice murder as a direct perpetrator, because Reyes himself did not proximately cause the victim's death through an act dangerous to human life. (See *Reyes*, *supra*, 14 Cal.5th at pp. 988-990.) In Nava's case, it is undisputed that Tank committed an act dangerous to human life that caused Ruiz's death; the question is whether Nava knew Tank would commit this act and intended to aid its commission. By contrast, *Reyes* did not address whether Reyes was guilty of aiding and abetting an implied malice murder for traveling into rival territory knowing his companion carried a gun. (See *id.* at pp. 990-992 [holding the superior court "misunderst[ood]" the elements of aiding and abetting implied malice murder and remanding for reconsideration of the evidence under correct legal standards]; see *People v. Casper* (2004) 33 Cal.4th 38, 43 ["It is axiomatic that cases are not authority for propositions not considered."].)

Nevertheless, Nava argues that even if he knew about Tank's gun, "there was no direct evidence that [he] wanted to harm Ruiz, knew that Tank may shoot Ruiz, or that [he] helped Tank in doing so," and no direct evidence that he knew Tank "well," "knew that Tank had a history of violence[,] or even that Tank was a B.M.S. gang member." He further contends there was "no evidence that [he] directed Martinez to point out Ruiz," "knew Martinez would do so," or that "Martinez or Tank told [him] their plans prior to entering the store." Nava argues there was "no evidence that Tank told [him] prior to entering the store that he was going to kill Ruiz or even use the gun at all," and "Tank may have formed the intention" later, because "his initial reaction to seeing Ruiz was only to punch him."

19

To the contrary, the evidence in the record before us allowed the superior court to reasonably conclude that Nava made a gang challenge frequently followed by violence, then decided to involve Tank, that he and Tank were members of BMS, that Nava called Tank a "homie" and knew where Tank lived, and that Nava wanted Tank to confront the suspected 38th Street members to further the interests of BMS in the ongoing territorial dispute. The evidence supported that Nava (not Martinez) invited Tank to the store, and that Nava knew to drop off Tank and Martinez together, then pick up Martinez to wait for Tank around the corner such that the superior court could reasonably infer that Nava knew about Tank and Martinez's plan to identify and confront the targets. Even if Nava did not know Tank would shoot Ruiz, the evidence supports that Nava knew of Tank's intention to violently confront the targets with a gun. (See *Nieto Benitez*, *supra*, 4 Cal.4th at pp. 107-108 [holding "brandishing a firearm" is an act dangerous to human life in the context of a "dispute with, and threats directed toward, the victim," "defendant's retrieval of a loaded handgun . . . [and] his prompt return to the scene," and "his initiation of the final confrontation"].) Nava's knowledge of and intent to aid Tank in this type of confrontation was sufficient evidence to allow the superior court to conclude Nava aided and abetted an act dangerous to human life.

C. *The Superior Court Did Not Misunderstand the Elements of Aiding and Abetting Implied Malice Murder*

Nava argues the superior court erred as a matter of law because it "fail[ed] to find the required mens rea" for implied malice murder and instead "only considered [Nava's] *conduct*

20

rather than his mental state." "[W]here there is an issue as to whether the [superior] court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes*, *supra*, 14 Cal.5th at p. 988.) Nevertheless, "'[w]e must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate error—it will not be presumed.'" *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523; *People v. Garcia* (1987) 195 Cal.App.3d 191, 198.)

Nava again relies on *Reyes*, *supra*, 14 Cal.5th 981. In *Reyes*, the Court remanded for a new evidentiary hearing because the superior court failed to "recognize that implied malice murder requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the direct perpetrator's life endangering act." (*Id.* at p. 991, italics omitted.) As stated, there was no evidence in *Reyes* that the petitioner caused the victim's death, and another gang member, Lopez, was the suspected shooter. (*Id.* at pp. 988-989.) The superior court did not consider "whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id.* at p. 992.)

The superior court did not similarly err at Nava's evidentiary hearing by failing to analyze Nava's knowledge and intent regarding Tank's actions. Rather, the court found that Nava "g[ot] Tank, br[ought] him back and ha[d] Tank brandish the gun." This statement reflected the court's finding that Nava knew Tank's intent to brandish the gun and intended to aid Tank in this act. While the court's statement did reference Nava's

21

conduct, as discussed in the previous section, Nava's conduct was circumstantial evidence of his knowledge and intent.

Nava argues that the court misapplied the legal standard by stating "what [Nava] did as aider and abettor was conduct that was a life endangering act." (But see *Reyes*, *supra*, 14 Cal.5th at p. 991 ["In the context of implied malice . . . [f]or the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act."].) Even if this statement mischaracterized the actus reus requirement for aiding and abetting implied malice murder, Nava does not affirmatively demonstrate that the superior court misunderstood or misapplied the associated mens rea. Indeed, the court separately recognized that Tank was the one who brandished the gun and further found that Nava "kn[e]w[] what was going to happen" when he "went and got Tank," and that Nava "picked [Tank] up to get the gun." These factual findings establish that the court correctly analyzed Nava's knowledge and intent regarding Tank's life-endangering act.

D.     *Nava Forfeited His Claim the Superior Court Should Have Considered His Youth as a Factor in His Mental State And Regardless, Any Error in Failing To Consider Youth was Harmless*

Nava, who was 20 years old at the time of the murder, argues the superior court should have considered his youth when analyzing whether he acted with implied malice. Citing *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*), he contends that his youthful age and immaturity affected his judgment, impulse control, and ability to appreciate risk. Nava concedes he did not

raise this issue in the superior court and asserts that his counsel was ineffective for failing to do so.

Nava argues he did not forfeit his argument because, at the time of his evidentiary hearing, the relevance of youth to implied malice was a "still-developing area of the law." (*Pittman*, *supra*, 96 Cal.App.5th at p. 416.) Before Nava's evidentiary hearing in May 2023, numerous "cases decid[ed] that youth is a relevant factor bearing on mental state in section 1172.6 petitions," specifically in the context of felony murder. (*Ibid.*; see *People v. Oliver* (2023) 90 Cal.App.5th 466, 485 (*Oliver*); *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091-1093; *People v. Keel* (2022) 84 Cal.App.5th 546, 562-563; *In re Harper* (2022) 76 Cal.App.5th 450, 470; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987; *In re Moore* (2021) 68 Cal.App.5th 434, 453-455; *People v. Harris* (2021) 60 Cal.App.5th 939, 960, rev. dism. and remanded on other grounds Sept. 28, 2022, S267802.) *Pittman*, decided in October 2023, similarly concluded that "youth is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability . . . in the context of implied malice murder." (*Pittman*, at p. 417.)

Nava "acknowledges that youth has been found to be a factor as to mental state prior to [his] evidentiary hearing," but he argues that *Pittman* was the first to apply this holding to aiding and abetting implied malice murder, and thus his claim is not forfeited. *Pittman* itself recognized, however, that the earlier decisions addressing youth as a factor in felony murder resentencing were "[t]he relevant appellate cases" for purposes of forfeiture. (*Pittman*, *supra*, 96 Cal.App.5th at p. 416.) *Pittman* concluded the petitioner had not forfeited his claim because his

evidentiary hearing took place in December 2020, before the relevant cases were "decided [in] 2021 or later." (*Ibid.*) For this reason, we conclude Nava could have asserted the relevance of his youth at his evidentiary hearing in May 2023, but he forfeited the argument. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 991 ["'[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct'"].)

Even if Nava had not forfeited the argument, we would find the court's failure to consider Nava's youth to be harmless. (See *Pittman*, *supra*, 96 Cal.App.5th at pp. 417-418 [applying prejudice standard from *People v. Watson* (1956) 46 Cal.2d 818].) "The cases discussing the role of youth in relation to criminal culpability 'stress two areas': youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.'" (*Pittman*, at p. 418.) Nava does not cite any evidence in the record suggesting he "felt compelled to assist in [the] murder," or that he was "swept up in circumstances beyond his . . . control that led to an unintended death." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489.) For this reason, we conclude there is no "reasonable possibility that the failure to consider [Nava's] youth impacted the trial court's decision." (*Pittman*, at p. 417.)[7]

---

[7]    Because we conclude any error in failing to consider youth factors was harmless, we need not decide Nava's ineffective assistance of counsel argument.

24

## DISPOSITION

The superior court's order denying Nava's section 1172.6 petition is affirmed.


MARTINEZ, P. J.

We concur:



SEGAL, J.                              FEUER, J.